**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re:                                                    :

                                                          :

HAIMIL REALTY CORP.,                                      :          Chapter 11

                                                          :

                          Debtor.                         :          Case No. 14-11779 (MEW)

----------------------------------------------------------------x

## OPINION REGARDING OBJECTIONS TO FINAL FEE
## APPLICATIONS OF PICK & ZABICKI LLP AND GLENN BACKER

APPEARANCES:

Douglas Pick, Esq.
Eric C. Zabicki, Esq.
PICK & ZABICKI LLP
New York, NY
   *Attorneys for Debtor Haimil Realty Corp.*

Christopher T. Bonante, Esq.
White Plains, NY
   *Attorney for the estate of Glenn Backer, Esq.,*
   *Special Counsel to Debtor Haimil Realty Corp.*

Manny Haimovich
   *Pro se*, owner of Haimil Realty Corp.

**MICHAEL E. WILES**
**United States Bankruptcy Judge**

       Before the court are the final applications of Pick & Zabicki LLP (the main bankruptcy

counsel to Debtor Haimil Realty Corp.) and the estate of Glenn Backer (regarding Mr. Backer's

work as chief litigation attorney to Haimil) for allowance of fees and reimbursement of expenses.

Pick & Zabicki seeks the final allowance of fees in the amount of $284,972.50 and

reimbursement of expenses in the amount of $6,016.01; of these amounts, $10,597.50 has been

paid through the approved application of the balance of a retainer payment.  (Dkt. Nos. 187,

198.)  The net unpaid amount sought by Pick & Zabicki is therefore $280,391.01.  Mr. Backer's

estate seeks a final allowance of fees in the amount of $79,059.16 and expense reimbursements of $5,941.50; of these amounts, $20,000 has been paid through the approved application of a retainer payment. (Dkt. No. 183.) The net unpaid amount sought by Mr. Backer's estate is therefore $65,000.66.

For the reasons set forth below the Court determines that reductions to the amounts sought by these applications are appropriate under the standards set forth in section 330 of the Bankruptcy Code. With respect to Pick & Zabicki, the Court grants a final allowance of fees in the amount of $229,972.50 and expense reimbursements in the amount of $6,016.01. After application of the prior $10,597.50 retainer balance this leaves a net allowed but unpaid administrative expense of $225,391.01.[1] With respect to Mr. Backer's estate, the Court grants a final allowance of fees in the amount of $49,059.16 and expense reimbursements in the amount of $5,941.50, leaving a net allowed but unpaid administrative expense (after the prior $20,000 retainer balance) of $35,000.66.

The Court will not enter an order directing payment of the foregoing amounts until it determines whether Haimil's cash is sufficient to cover all remaining expenses and claims, as the confirmed plan of reorganization requires. The parties are directed to appear before the Court at a conference on December 12, 2017 at 10:00 a.m. to discuss that issue.

---

[1]    The Pick & Zabicki application seeks final allowance of "net" fees and expenses after application of the retainers. However, all of the total post-petition fees and expenses (before application of the retainers) are properly subject to this Court's review and approval under section 330 of the Bankruptcy Code. This decision therefore is framed in terms of the total post-petition fees and expense reimbursements that are allowed, with the unpaid balances determined after application of the retainers.

**Background**

Debtor Haimil Realty Corp. borrowed money from Dominion Financial Corporation to fund the renovation of a building and a condominium conversion.  Disputes over the loans led to a state court foreclosure action in August 2012, the filing of this bankruptcy case in June 2014, the removal of the state court foreclosure action to this Court, and ultimately to a trial in September 2015.  After trial, the Court ruled that Haimil was indebted to Dominion in the amount of $2,608,526.05 as of February 16, 2016, representing a principal balance of $1,225,427.21 and accrued interest of $1,383,098.84.  The Court also held that the debts owed to Dominion were secured obligations.  *See Dominion Fin. Corp. v. Haimil Realty Corp. (In re Haimil Realty Corp.)*, 546 B.R. 257 (2016).

After further conferences with the parties, the Court issued an Order dated May 2, 2016 that noted that Haimil had stated its desire to pursue refinancing or sale options that would enable a repayment of the debt owed to Dominion in the context of the chapter 11 bankruptcy case (rather than having a foreclosure judgment entered and allowing Dominion to pursue foreclosure), and that Dominion had not objected to that approach.  The Order directed that Dominion's proof of claim be allowed in the amount of $2,608,526.05 as of February 16, 2016, with interest continuing to accrue on the unpaid principal from and after February 16, 2016 at the default rate of 24% specified in the parties' contract, provided that the property that secured the claim had sufficient value to cover the interest accruals.  The Court also dismissed the foreclosure proceeding, but gave Dominion the right to seek to reopen that proceeding on or after August 1, 2016, and to renew its request for foreclosure relief, "if, prior to that date, Haimil has not obtained approval of a sale and/or financing (whether through a plan of reorganization or by motion) that provides for the payment of Dominion's allowed claim or that fully secures that

3

allowed claim pending appeal." *See* Order dated May 2, 2016 (Docket No. 93; *see also* Docket

No. 57 in Adv. Pro. No. 14-02052).

Haimil filed an appeal from this Court's Orders, and interest continued to accrue while

the appeal was pending. Meanwhile, Haimil did not seek or obtain approval of a sale or

financing that would permit repayment of the debt. In December 2016, Dominion filed a motion

to convert the case to a liquidation proceeding under chapter 7 of the Bankruptcy Code. The

Court heard arguments of the parties in January 2017, at which time the Court expressed

unhappiness with the pace at which Haimil had pursued the confirmation of a plan of

reorganization. The Court issued an Order on January 10, 2017 in which it stated:

> This chapter 11 case has been pending for more than 2-1/2 years, and eleven
> months have elapsed since this Court issued its opinion regarding the
> amounts owed to Dominion. Mr. Haimovich has lived in the property, rent-
> free, since the chapter 11 case was filed. It appears that no efforts were made
> to pursue a refinancing, or a sale, or a plan of reorganization until after this
> Court issued its opinion in February 2016. In addition, although Haimil has
> elected to pursue sales of a commercial unit and possibly of a residential unit
> pursuant to amendments to a condominium offering plan, it appears that
> nearly six months elapsed between Haimil's receipt of comments on the
> proposed amendments in mid-2016 and the filing of Haimil's responses
> thereto. On the whole it is plain that this case has not proceeded towards a
> resolution with the speed or with the diligence that the Court expects and that
> Dominion and other creditors have the right to expect.

The Court therefore ordered that Haimil take steps to confirm a chapter 11 plan of reorganization

on or before April 28, 2017, failing which the case would be converted to a case under chapter 7.

*See* Order dated January 10, 2017 (Docket No. 127). The Court later extended the confirmation

deadline, for cause shown, to May 23, 2017. *See* Order dated April 26, 2017 (Docket No. 161).

In the meantime, the District Court issued an order affirming this Court's opinion and orders

regarding the Dominion claim against Haimil. *See* Order dated April 6, 2017 (Docket No. 63 in

Adv. Pro. No. 14-02052).

After additional proceedings, this Court entered a confirmation order on May 24, 2017.

The confirmed plan requires payment in full of all claims and the retention, by Mr. Haimovich,

of the equity interests in Haimil.  Subsequently, Haimil sold the commercial unit in the relevant

building and obtained a loan secured by the remaining penthouse unit in the building, and used

the proceeds to pay the accumulated debt to Dominion.  The closings occurred on July 31, 2017.

By the time the closings occurred, the amount due and owing to Dominion had increased to

$3,105,563.43, with the additions made up of interest accruals and required attorney fee

reimbursements.

The following table shows just how rapidly the Dominion debt rose during the course of

the parties' disputes, primarily due to the contractual default interest rate of 24%:

| Date | Event | Amount Owed[2] |
|------|-------|----------------|
| 8/29/12 | Foreclosure Case Filed | $1,574,265.29 |
| 6/11/14 | Petition Date | $2,106,100.90 |
| 2/16/16 | Bankruptcy Court Decision | $2,608,526.05 |
| 4/6/17 | District Court Affirmance | $2,942,659.20 |
| 7/31/17 | Payoff Date | $3,105,563.43 |

The final payoff amount was almost twice the amount that had accrued as of the date of the

commencement of the foreclosure action, and almost one million dollars more than the accrued

amount as of the petition date.

---

[2]   The first three figures in the table are taken from the calculations attached to the Court's
February 16, 2016 Opinion.  The amount due as of April 6, 2017 has been calculated using
the same spreadsheet that was used for the other calculations, but does not include $67,500 of
Dominion's attorneys' fees on appeal that may have accrued before that date but that were not
awarded until May 2017.  *See* Order dated May 24, 2017 (Docket No. 176).  The final payoff
amount has been taken from filings made by Haimil and presumably includes principal,
interest, fees, taxes and all other relevant items.  *See* Status Report Closing Statement and
Payment Confirmations Re: Sale of Debtor's Commercial Condominium Unit, filed
08/01/2017 (Dkt. No. 194); *and* Status Report Closing Statement and Payment Confirmations
Re: Exit Financing, filed 08/01/2017 (Dkt. No. 195).

## Fee Applications and Objections

After confirmation of the plan, various retained professionals filed applications for allowance of their fees and expenses pursuant to section 330 of the Bankruptcy Code. Some applications were later supplemented to cover work done between the confirmation date and the closing of the refinancing and sale transactions. Dominion filed an objection to the final professional fee applications in July 2017, but Dominion's debt was repaid a few weeks later and Dominion has withdrawn its objections.

The fee applications originally were scheduled to be heard on July 27, 2017 but the hearing was adjourned several times. On September 8, 2017 (four days before the rescheduled hearing on September 12), Manny Haimovich, the equity owner of Haimil, filed an objection to the pending fee applications. At the September 12, 2017 hearing, however, Mr. Haimovich acknowledged that he only had outstanding objections as to the applications filed by Pick & Zabicki and Mr. Backer's estate, as his objections to other applications were either being withdrawn or had been resolved.

Many of Mr. Haimovich's objections to the attorneys' applications related to the manner in which the requested fees and expenses had been documented and the sufficiency of the time records that had been offered in support of the applications. Mr. Haimovich contended that (a) the lawyers had duplicated their work, (b) Pick & Zabicki had worked outside the scope of its approved retention, (c) expense reimbursements were not proper, (d) the attorneys' time records included impermissible "blocked" time entries, (e) time entries and expenses were impermissibly vague, (f) lawyers had submitted "pattern" time entries, and (g) the time entries reflected the performance by attorneys of clerical or administrative tasks. These objections were based almost entirely on a report prepared by David H. Paige, Esq. of Legal Fee Advisors, which was

submitted as an attachment to Mr. Haimovich's objection.  Mr. Paige was not offered as a

witness and his report was not submitted in a form that would permit it to be considered as

evidence.  The Court nevertheless considered the report as a statement of contentions and

objections by Mr. Haimovich.

At the September 12 hearing, the Court overruled most of Mr. Haimovich's objections.  It

was known throughout these cases (especially by Mr. Haimovich himself) that Mr. Backer and

the Pick & Zabicki firm were dividing work on various aspects of the Dominion claims and

litigation.  There was no impermissible duplication of work, and there was no impermissible

work outside the scope of the attorneys' respective retentions.  As to the time records: the Court

noted that the objection (and the report) had not identified most of the particular time entries that

allegedly were deficient, or that allegedly showed improper or duplicative work.  Instead, the

report prepared by Mr. Paige merely stated his personal conclusions as to the number of

problematic time entries, with only scattered examples of the time records that allegedly

supported his criticisms.  The Court held that, in context, the few samples of supposedly

deficient entries that were specifically identified in Mr. Haimovich's submission and in Mr.

Paige's report were not problematic and did not call for the disallowance of fees and expenses.

Furthermore, the Court had made its own review of the time records and expense submissions, and that

review had not disclosed any issues that required reductions.

Mr. Haimovich also contended in his objection that he would not have hired Pick &

Zabicki, during the state court litigation that preceded the bankruptcy case, if he had known that

its main expertise was in bankruptcy practice, a fact he allegedly only discovered after the state

court had ruled on various motions.  But Mr. Haimovich's submission included a statement that

he learned the relevant information before the bankruptcy filing.  (Dkt No. 204, at pp. 1-2.)  This

was not grounds on which to challenge Pick & Zabicki's right to compensation for the work that occurred during the bankruptcy case.

Mr. Haimovich further contended that Pick & Zabicki had failed to disclose potential conflicts of interest, namely (a) that it represented that it had not received any payments during the 90-day "preference" period whereas in fact it had received two such payments totaling $5,000, and (b) that Mr. Pick felt he was unable to file objections to claims that were later filed by another attorney, Mr. Verzani, who apparently had a significant role in determining Haimil's litigation strategy but who was not retained during the bankruptcy case. Mr. Haimovich argued that Mr. Pick's refusal to handle objections to claims filed by Mr. Verzani also amounted to a breach of the terms of his employment. These objections were not well-taken.

As to the non-disclosure of payments during the preference period: the Court was satisfied that the failure to disclose the minor pre-bankruptcy payments was inadvertent. In addition, while it is true that payments during a preference period may create the possibility that a law firm is a "creditor" and therefore is not disinterested, any objection that Mr. Haimovich wished to make on this ground should have been asserted at the time the retention originally was proposed – particularly since all the pre-bankruptcy payments were made by Mr. Haimovich himself. Mr. Haimovich cannot use his failure to raise this particular issue at the time of retention as an excuse to obtain free services from his retained counsel or as grounds for an involuntary fee reduction. It would be particularly inappropriate to impose penalties for the inadvertent disclosure lapse here because the parties acknowledged throughout these proceedings that Haimil's assets had sufficient value to permit full payments to all creditors, so that there were no "preference" issues of consequence.

As to Mr. Verzani: it is often the case that retained counsel may encounter particular objections, or claims by particular creditors, that retained counsel believes it cannot handle. The existence of a conflict with respect to a discrete issue does not disqualify a firm from acting as primary bankruptcy counsel. Nor is it a breach of retention terms for an attorney to notify a client of a conflict when one arises. Mr. Pick's conclusion that he would be unable to handle a particular claim objection just represented a studious adherence to the ethical rules that govern lawyers' behavior, and not a breach of retention terms. Complaints about work that Mr. Pick did not do, and that might have to be done by someone else, do not justify a reduction in the fees that have been sought for the work that Pick & Zabicki actually did.

While the Court rejected the foregoing challenges to the fee applications, it also observed that Mr. Haimovich had raised much more serious issues in his objection regarding the value of the services provided by Pick & Zabicki and by Mr. Backer. Mr. Haimovich claimed, essentially, that the attorneys had provided bad advice, with disastrous financial consequences, regarding the litigation with Dominion and regarding the completion of the steps needed to confirm a plan of reorganization. He contended that the litigation advice caused him to forego favorable settlement opportunities, and that his attorneys' failure to pursue a reorganization plan in an organized and timely way put him in the position of having to sell Haimil's commercial property on a rushed basis, resulting in a loss of significant value. The Court ruled that a further evidentiary hearing would be needed to address these issues. The Court directed Pick & Zabicki and the Backer estate to submit their responses to Mr. Haimovich's objections on these points, and scheduled an evidentiary hearing.

Subsequently, on or about September 28, 2017, the Court received an additional submission by Mr. Haimovich that addressed the outstanding issues but that also attempted to

supplement his contention that the attorneys had unnecessarily "duplicated" their work. He also submitted a revised version of Mr. Paige's report that purportedly provided further details as to his criticisms of alleged time-keeping discrepancies. *See* Docket No. 212 dated September 26, 2017. Pick & Zabicki promptly objected to these additional late-filed submissions. On October 3, 2017, the Court entered an Order directing that those portions of the new submission that related to the value of the services performed by the relevant attorneys would be treated as a pre-trial submission and as a submission of proposed evidentiary exhibits, the admissibility of which would be determined at the evidentiary hearing, but that the portions of the submission that related to time-keeping issues, alleged duplication of services, and the other issues that had been addressed at the September 12, 2017 hearing would be stricken. The Court also ruled that to the extent the submission was meant to be a motion to re-argue the issues already decided, such request was denied. *See* Order, dated October 3, 2017, Docket No. 211.[3]

The trial then proceeded on October 11, 2017. Mr. Haimovich and Mr. Pick testified, and various exhibits (not including any of Mr. Paige's reports) were offered and received into evidence. Mr. Haimovich testified that he would have settled Dominion's claims much earlier, and at a much lower price, but that his lawyers dissuaded him from doing so based on their insistence that he had a very strong case and that their analyses showed that he owed little or no money to Dominion. Mr. Pick, by contrast, testified that Mr. Haimovich was dead-set on

---

[3]  For the sake of completeness, it should be noted that the additional report by Mr. Paige was still largely conclusory, expressing opinions as to numbers of time entries that reflected duplication or that allegedly violated local rule requirements but providing no clear notice and compilation of the allegedly offending entries. The items that were identified in the report as examples of time-keeping problems shows that the report was more of a "nit-picking" exercise than a reasonable evaluation of the attorneys' time records and divisions of responsibilities. The Court made its own review of the time and expense records in advance of the September 12 hearing and found no time-keeping problems or expense reimbursements that were serious enough to warrant any reductions.

defeating each and every part of Dominion's claim, that he was fully informed as to the risks of litigation and that he was an eager participant in the conduct of the litigation.

## **The Relevant Standards**

The fee applications before the Court are governed by section 330 of the Bankruptcy Code, which contemplates the allowance of "reasonable compensation for actual, necessary services" and reimbursement of "actual, necessary expenses." 11 U.S.C. § 330(a)(1). The statute makes clear that the Court may "award compensation that is less than the amount of compensation that is requested." *Id*. § 330(a)(2). The Court is to take into account "all relevant factors" in determining a reasonable compensation amount, including:

(A)   the time spent on such services;

(B)   the rates charged for such services;

(C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)   whether the compensation is reasonable based on the customary compensation charged by similarly skilled practitioners in cases other than cases under this title.

*Id*. § 330(a)(3). A Court "shall not allow" compensation for "unnecessary duplication of service," for services that were not "reasonably likely to benefit the debtor's estate," or for services that were not "necessary to the administration of the case." *Id*. § 330(a)(4).

The factors listed in section 330 are not exclusive, and a court has wide discretion in determining the amount of reasonable compensation. *Zeisler & Zeisler, P.C. v. Prudential Ins.*

11

*Co. of Am. (In re JLM)*, 210 B.R. 19, 23 (2d Cir. BAP 1997).  Among other things, a court may consider the results that were obtained by counsel, and the quality of the advice and services that were provided.  *In re Parkview Care & Rehab. Ctr., Inc.,* No. 08-71867-DTE, 2010 WL 3517069, at *4 (Bankr. E.D.N.Y. Sept. 7, 2010).

Things often go wrong in litigation, and a court must keep in mind that attorneys are not guarantors of outcomes.  There are many times when attorneys litigate close issues with great skill, and in good faith, but nevertheless do not prevail.  Services that are performed well, with due adherence to an attorneys' duties and in the good faith litigation of disputes that need to be litigated, are "necessary" and "beneficial" services for which compensation is owed, regardless of whether the client won or lost the underlying case.  *In re JLM*, 210 B.R. at 24, 27; *see also In re Keene Corp*., 205 B.R. 690, 696 (Bankr. S.D.N.Y.1997) (noting that the test applied is not based on hindsight, but rather is objective and a court considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances.")

On the other hand, attorneys should weigh the costs against the likely benefits, having due consideration for the likelihood of success, when they pursue litigation.  *In re Keene Corp.*, 205 B.R. at 696 (a reasonable attorney "must weigh the likely benefit to the creditors against the likely cost"); *see also In re Angelika Films 57th Inc.*, 227 B.R. 29 (Bankr. S.D.N.Y. 1998) ("[a]n attorney should only proceed with a legal service if the potential benefit of the service, which takes into consideration the chances of success, outweighs the costs).  A lawyer "owes a professional duty to the client to recommend that no action be commenced if the cost of the battle exceeds the value of the litigation."  *In re Arnold*, 162 B.R. 775, 779 (Bankr. E.D. Mich. 1993) (citation omitted).

### Reasonable Compensation in This Case

Some of Mr. Haimovich's complaints about the performance of the attorneys related to actions they took during a state court foreclosure case that preceded the bankruptcy filing. However, the only issue before this Court is whether the attorneys are entitled to compensation for the work they did during this case. No claims have been made against them as to their prior work, and so issues that relate to advice given (and work done) prior to the bankruptcy filings will be disregarded.

As to the remaining objections: many services were performed in this case for which compensation is proper. Mr. Haimovich's complaints focus on the quality of the services provided with respect to the litigation with Dominion, and with respect to the timeliness of preparations for the confirmation of a plan of reorganization.

### A.      The Dominion Litigation

Dominion claimed that it had made loans to Haimil pursuant to a $3.4 million note; that it had made additional loans after the full $3.4 million had been advanced; that the parties later signed a "back-dated" $4.0 million note to cover these additional advances; and that a balance remained due and owing on the outstanding debts. Dominion did not keep very good records and Haimil apparently kept no records, but admittedly it was not difficult to reconstruct the advances that Dominion had made from bank records and other documents. Hr'g Tr. 134:21-135:9, October 11, 2017 (Dkt. No. 219). For the same reason, it was relatively easily to reconstruct the dates and amounts of the repayments that Dominion made. Hr'g Tr. 134:7-20. The chief differences between the parties, then, arose from their different calculations of the interest that had accrued over time and the different manner in which they applied the prior

payments.  Haimil also argued that for various reasons Dominion had acted with unclean hands and should not be allowed to enforce the signed loan documents in accordance with their terms.

There were many arguments that Haimil made that the Court found to be perplexing.  The chief ones were:

- Haimil argued that it owed no interest on any advances made after the $3.4 million note had been fully advanced.  However, the $4 million note clearly stated otherwise.  The testimony at trial also clearly showed that the parties had agreed, when the first $3.4 million had been fully advanced, that additional advances would be made on the same terms as the prior advances.  There never was any legitimate basis to dispute that interest should have accrued on all advances.

- Haimil argued that the "back-dating" of the $4.0 million note made it unenforceable.  However, Haimil never cited any legal reason why the back-dating allegedly should be fatal to the enforcement of the note.  It was clear from the testimony at trial that Mr. Haimovich was aware of the back-dating when he signed the note.

- Haimil's calculations applied all repayments to "principal" instead of first applying them against accrued but unpaid interest.  This was contrary to well-established rules.  *See Shepard v. City of New York*, 110 N.E. 435 (N.Y. 1915); *see also Spang Indus., Inc. v. Aetna Cas. & Sur. Co.*, 512 F.2d 365, 371-72 (2d Cir. 1975).  Haimil's unfounded approach had the effect of arbitrarily reducing the calculation of the "principal" that remained outstanding, and also of arbitrarily reducing the additional interest that continued to accrue with respect to that outstanding principal.

- Haimil argued that no default interest should have accrued, even though the documents that the parties signed made it perfectly clear that default interest would accrue automatically from and after the date on which a foreclosure action was filed.

- During the state court litigation that preceded the bankruptcy case Dominion had briefly relied on a purported $1 million note that Dominion's witness had found among Dominion's papers, only to have Haimil point out that the note appeared to be a forgery. Dominion then promptly withdrew any reliance on this purported note. The note received no mention during the bankruptcy proceedings – except, that is, for Haimil's persistent arguments that the prior state court references to the note showed "unclean hands" and that Dominion should be denied any recovery, or at least any interest accruals. The repeated references to the "forged note," and the attorneys' apparent conviction that it sufficed to deprive Dominion of its rights under the notes that Mr. Haimovich admittedly did execute, made little sense. The $1 million note had no effect at all on the bankruptcy proceedings or on the computations of principal and interest (all of which were based on other records).

It is true that Dominion's claims raised some significant issues that legitimately needed to be resolved and that were litigated properly and in good faith. For example, Dominion claimed that it was entitled to "compound" interest, a contention with which this Court ultimately disagreed. But the question of whether interest accrued at a compound rate (as Dominion contended) or at a simple rate of interest (as the Court ultimately found) could have been raised, litigated and determined early in this bankruptcy case, at a fraction of the time and cost that

15

ultimately was expended on the litigation.  The same is true as to whether repayments should

have first been allocated to "secured" or to "unsecured" debts, which affected the extent to which

interest might have continued to accrue after the date of Haimil's bankruptcy filing.  *See* 11

U.S.C. § 502(b)(2).[4]  Those issues did not require the amount of time, and expense, that

ultimately was devoted to the litigation.

The attorneys argue that Mr. Haimovich was aware of the risks and approved the

foregoing litigation strategy and all of the arguments that were made.  Under the terms of the

confirmed plan, all creditor claims are to be paid, and Mr. Haimovich has retained all of the

equity interests in Haimil.  The fees to be awarded therefore will affect only Mr. Haimovich;

they will not affect creditors or other parties.  If (as the attorneys contend) Mr. Haimovich had a

full appreciation of the risks he was running, and of the weaknesses of the key defenses that were

being asserted, and if he nevertheless knowingly endorsed litigation on those terms, then there is

some force to their argument that it would be unjust to reduce the attorneys' fees for Mr.

Haimovich's benefit.

It does appear to the Court that Mr. Haimovich wanted a vigorous defense of Dominion's

claims, despite his current contentions to the contrary.  The evidence showed that Mr. Haimovich

was convinced, even before he retained Pick & Zabicki and Mr. Backer, that Mr. Haimovich had

---

[4]    The Dominion debt had secured and unsecured components.  The parties disputed whether
payments should be allocated first to the reduction of the "secured" obligations (as Haimil
contended) or first to the "unsecured" obligations (as Dominion contended).  This was a
legitimate issue that needed to be resolved.  For the sake of clarity, however, it should be
noted that this particular allocation issue was different from the question of whether
payments should first be applied against principal or against accrued interest.  Both the
secured and the unsecured debts included "principal" and "interest" components.  As noted
above, Haimil's calculations, which applied payments first against principal instead of
applying them against accrued interest, was contrary to well-established New York rules.

16

already repaid most, or all, of what he had owed.  Mr. Haimovich was also convinced, from a

time that preceded the bankruptcy filing, that Dominion had been dishonest (especially with

respect to the $1 million note) and that Dominion's claim therefore should be defeated.  In

addition, by his own testimony Mr. Haimovich was the author or recipient of "thousands" of

emails in which the progress of the litigation, and the arguments being made, were discussed.

Hr'g Tr. at 33:17-22; 44:24-45:13.   He acknowledged that he received and reviewed all the court

filings, knew the arguments being made, asked questions about them and received answers.  Hr'g

Tr. at 45:11-46:6.  He also received monthly fee statements from the attorneys, and did not

challenge them. Hr'g Tr. 89:23- 90:8.

Mr. Haimovich testified that his attorneys had failed to recognize that the underlying

documents called for default interest to accrue from and after the date of a foreclosure case, and

that they should have challenged Dominion's efforts to collect default interest from earlier dates.

Hr'g Tr. at 10:15–13:8.  However, that criticism was focused on the pre-bankruptcy state court

litigation.  During the proceedings before this Court, the attorneys for Haimil took the position

that default interest should not accrue at all.  Dominion's witness (Mr. Rinzler) stated that

Dominion would only seek default interest from and after the filing of the foreclosure case.  *See*

Written Opinion, 546 B.R. at 265.  So there were no issues about earlier default interest

calculations that Haimil's attorneys failed to challenge.  (Other issues about interest calculations

are discussed below.)

Mr. Haimovich also testified that defenses based on the "forged note," and arguments

that no interest accrued on the $4.0 million note, should not have been pursued.  He contended

that he told the attorneys that he did not believe there was merit to the points.  However, he

acknowledged that he was aware that the defenses were being asserted, and confirmed that he

never asked the attorneys to drop the issues.  Hr'g Tr. at 15:13-16:14.  The evidence at trial

included emails in which Mr. Haimovich expressed his own conviction that the forged note

proved that Dominion was dishonest and that this issue should be emphasized.  One such email

post-dated the issuance of this Court's Written Opinion, and reflected Mr. Haimovich's desire to

continue to press his complaints about the forget note on appeal.  The evidence also included

emails that confirmed that Mr. Pick expressed the opinion that Haimil should not make the

argument that no interest accrued on advances made after the first $3.4 million, and that Mr.

Backer recognized that pursuing that argument would be a "tough mountain to climb."  Mr.

Haimovich was copied on those emails.  However, Mr. Backer concluded that the issue should

be pursued, primarily after additional input from Mr. Verzani.

The Court is satisfied from the evidence that Mr. Haimovich knew what was being

argued.  However, it is less clear that the attorneys ever provided Mr. Haimovich with a realistic

appraisal of the likely outcomes on these issues, or (more importantly) of the risks of further

litigation and delay in light of the mounting interest accruals.  Mr. Haimovich claims they did not

do so.  Mr. Pick claimed in very general and conclusory terms that the attorneys had done so, but

no other evidence was offered to show that this occurred.

The emails in evidence confirm that the attorneys adopted a view of the potential

outcomes that was far more optimistic than the circumstances warranted, and that they so

advised Mr. Haimovich.  Mr. Backer caused Haimil to retain an accountant (Mr. Linker) to

prepare calculations of the amounts that Haimil believed were owed to Dominion.  Mr. Linker

prepared a spreadsheet that showed that the entire amount owed was approximately $146,000.00,

$93,000.00 of which was principal that remained outstanding.  The emails that are in evidence

suggest that, even at the time of trial, the attorneys advised that the "worst case" was that interest

would accrue on the principal amount that Mr. Linker had calculated, and that is the way that

they discussed the prospects with Mr. Haimovich.  However, that view of the potential outcomes

was absurd.

As noted above, the attorneys instructed Mr. Linker that he should assume that no interest

was owed except on the first $3.4 million of advances that Dominion made.  They knew that

their arguments in this regard were weak, at best.  In addition, as also noted above, Mr. Linker

applied all of Haimil's payments to "principal" and applied none of them to accrued interest.

This approach to the calculations was unjustified, and it artificially and significantly reduced the

calculation of the outstanding principal that remained.  The attorneys sent comments to Mr.

Haimovich in which they derided Dominion's contention that it would need more than $1 million

to resolve the matter, contending that Dominion's counsel was delusional.  But if Haimil's

attorneys had simply instructed their accountant to accrue interest on all advances at a 12%

interest rate (as the facts plainly required and as the attorneys privately recognized in their

contemporaneous emails), and to apply repayments first against accrued interest (as New York

plainly law called for), then it would have been clear that the remaining outstanding principal

exceeded $1 million and that any gap between the parties was relatively small.

The Court finds credible Mr. Haimovich's testimony that he was never given a realistic

"worst case" appraisal of the potential outcomes and of the risks he was running.  Default

interest accrued at the rate of 24%, so the accruals on the actual principal balance that was

outstanding (which the Court found to be in excess of $1.2 million) were extremely high.  The

Court does not have a full collection of emails between Mr. Haimovich and the attorneys in

which the potential outcomes were discussed, but as noted above the ones that were provided all

suggest that Mr. Linker's calculations were presented as though they presented a sound

calculation of the principal that actually was outstanding, so that any additional interest would accrue only on that sum. The attorneys should have known that Linker's calculations were based on indefensible assumptions, at least some of which the attorneys had instructed Mr. Linker to make. Yet no other calculations were made. Hr'g Tr. at 137:2-17; 140:5-41:16. In fact, Mr. Linker confirmed, at the original trial with Dominion, that he was instructed *not* to make calculations using other assumptions. Trial Tr. at 90:14-17, September 21, 2015 (Adv. Pro. No. 14-2052; Dkt. No. 37).

Based on the evidence at the hearing the Court concludes that in this particular case Mr. Haimovich was given an unreasonably rosy impression of the likely benefits of litigation as compared to the likely risks. One will never know for sure, of course, whether different advice would have made a difference. Mr. Haimovich contended that he had the opportunity to settle Dominion's claims for approximately $1.6 million just before the main trial commenced. The Court finds, based on the evidence, that the actual proposal that Dominion made was to settle for a repayment of approximately $1.6 million in principal plus interest at 12%, with no default interest accruing. The offer was rejected because it was so far out of line with the amounts Mr. Linker had calculated. Certainly a more realistic calculation of the reasonable differences between the parties' calculations would have made it plain that settlement was a far better option, given the risk that interest would continue to accrue at the rate of 24%, and might well have produced a far more sensible outcome to the litigation.

An attorney's job is to give good advice – even sobering or unwelcome advice when the circumstances call for it – and not just to make zealous arguments that feed a client's desires to do battle. The Court therefore believes that some reduction to the amounts sought in connection with the Dominion litigation is proper.

### B.    Plan Preparations

The Court noted in December 2016 that it appeared that no efforts had been taken to pursue a plan of reorganization, or a refinancing of the Dominion debt, until after this Court rendered its Opinion following trial.  The time records that have been submitted in support of the final fee applications confirm the Court's observation.  The emails that were offered in evidence show that Mr. Pick did advise Mr. Haimovich, shortly after the trial, that he should consider making arrangements to borrow money so that he would be in the position to act quickly in the event this Court determined that Haimil owed money to Dominion.  But that is the only record that was offered to the Court showing any preparations for a plan, a refinancing or other actions that might have ameliorated the crushing burden of the Dominion interest accruals.

Given the values of Haimil's properties, better planning should have permitted a better outcome.  At the time of trial, Haimil owned a "commercial" unit and an uncompleted residential penthouse unit at the relevant property.  The parties always agreed that the values of these units exceeded the amounts owed to Dominion (no matter whose calculations of those amounts one wished to consider), and the transactions that were completed following the confirmation of the plan of reorganization confirmed that fact.  If Haimil had been ready to proceed with a reorganization plan when the Court issued its Opinion – or if it had even been ready to borrow enough money to enable it to post a bond that would stay a judgment in favor of Dominion until appeals were exhausted – the crippling interest accruals could have been abated.  Instead, Haimil pursued an appeal that was weak and that had little chance of success, and allowed hundreds of thousands of additional interest accruals to occur.

On the other hand, the Court does not accept Mr. Haimovich's testimony that these problems were entirely the fault of counsel.  Mr. Haimovich lived in the penthouse unit without

paying rent.  One of the purposes of the bankruptcy filing was to avoid the appointment of a

receiver and to allow Mr. Haimovich to continue to manage the property.  He was not eager to

sell any of the units that Haimil owned.  He did not heed Mr. Pick's advice to nail down

financing options in the fall of 2015.  Despite Mr. Haimovich's current frustrations, and his

belief that his attorneys are the sole sources of his problems, in fact it appears to the Court that

Mr. Haimovich was not in any hurry to end Haimil's bankruptcy and that he was happy to hold

Dominion at bay while the litigation proceeded.

Nevertheless, the absence of any indication that any work was done prior to February

2016 to put Haimil in the position to move forward once the Dominion litigation was resolved,

other than one stray email that suggested that Mr. Haimovich think about obtaining a loan, is

very disturbing to the Court.  There ultimately were snags in the pursuit of required amendments

to Haimil's condominium offering plan, and so the failure to turn to these issues until after the

Court issued its decision ultimately caused significant (though perhaps unintended and

unpredicted) financial loss to Haimil, as interest continued to accrue while these matters were

pursued.[5]

### C.     Appropriate Reductions

Mr. Backer worked only on the Dominion litigation.  The Pick & Zabicki firm worked on

some aspects of that litigation (including taking primary responsibility for the preparation of an

objection to Dominion's proof of claim) but also worked on other matters.  It appears from the

time records that prior to early 2015 Mr. Backer primarily handled the underlying discovery and

depositions, while Mr. Pick consulted only on some aspects of strategy.  Mr. Pick became more

---

[5]     Haimil retained separate counsel to pursue amendments to its condominium offering plan,
and that firm has already agreed with Mr. Haimil to reduce its requested fees.

heavily involved when the claim objection had to be prepared and filed after April 2015. He also attended the depositions of the main witnesses. By the time of trial it was clear that both firms were well-engaged in various aspects of the litigation: Mr. Backer as primary litigation counsel, and Mr. Pick as the primary draftsman of the pretrial order and various briefs and other papers. Pick & Zabicki also handled the entire appeal from this Court's decision, which followed the unfortunate death of Mr. Backer. Mr. Backer (apparently with input from Mr. Verzani) took the lead role in giving instructions to Mr. Linker; Mr. Pick commented on the interest accruals, as noted above, but there is no evidence that he was otherwise involved in them.

There is no exact way to compute an appropriate adjustment to the fee applications given that (a) the Court's concerns relate primarily to the quality of some of the advice that was provided (rather than to particular time entries that might be disallowed), and (b) Mr. Haimovich was aware of what was happening, even if he did not receive the kind of sobering and frank advice that the situation called for. The Court must instead exercise its judgment and discretion as to the quality of the work and the advice that was provided and what constitutes fair and reasonable compensation under the circumstances of the case. The Court concludes that in light of the foregoing Mr. Backer's fees should be reduced by $30,000 and that the fees of Pick & Zabicki should be reduced by $55,000. The parties are directed to submit an order that reflects these rulings.

Dated: New York, NY
        December 8, 2017


                                        **/s/Michael E. Wiles**
                                        **United States Bankruptcy Judge**